Caroline Hunt Trust Estate v. United States Caroline Hunt Trust Estate v. United States Caroline Hunt Trust Estate v. United States Caroline Hunt Trust Estate v. United States Caroline Hunt Trust Estate v. United States Mr. Dinson. Thank you, Your Honour. May it please the Court. The trial court incorrectly held that the Trust had stand-in based on an alleged express overarching contract. There is no basis either legal or factual for such a contract. The parties structured the deal so that only the thrift made the acquisition and only the thrift took the risk. Southwest Savings signed the thrift, signed the acquisition agreements. There were four of them to acquire the thrifts. Each of those agreements had sole benefit clauses. The Trust chose not to sign those agreements. They chose to structure the deal that way. Is it correct that this is your only challenge to the merits, to the substance, as to whether the party is correct? First, we're challenging standing based on the absence of a contract. And then we're also challenging that if there was the alleged express contract, whether a term of that contract is the capital credit and whether what they're seeking on restitution, the sub-debt contribution and the equity contribution, whether those were terms as well. So those are liability arguments, Your Honour. Southwest Savings signed the assistance agreement, which included the forbearance and the resolutions. That also has a sole benefit clause. And again, the Trust chose not to sign it. They chose to structure the deal that way. This is the only WinStar case that has been before this court, and I believe the only WinStar case at all, where the shareholder is less obligated to cover the losses of the thrift after the deal than they were before. They have less of an obligation. They step back from the obligation. And that's because the Trust and the thrift that entered into the transaction, they chose to structure the deal that way. They chose to use the corporate form to protect the Trust from liability. Did they also step back when they removed their liability under the maintenance agreement? Absolutely, Your Honour. What happened is in the assistance agreement that was signed by the thrift, there's a term that calls for the Federal Home Owned Bank Board to release the Trust from liability. So what happened was the Trust got released, and they were able to step back. Before the transaction, the Trust was liable for maintaining the capital of the thrift unlimited. After the transaction, after the thrift made the acquisition, they had no outstanding liability. Well, they did contribute something in consideration for their release. The thrift did because the thrift bargained for and obtained the release, but the Trust did not participate in the negotiation. It wasn't a party to anything, so it did not bargain for or contribute anything to get the release. Well, they were a party to the maintenance agreement. But that was a preexisting agreement signed in – I believe there were two letters. One was signed in 83 and one was signed in 86. In 86, right. So those preceded this 1988 transaction. In this transaction, they sort of did the reverse. Instead of committing themselves, as the Court has found in some cases, they got out of the preexisting stipulation. They were specifically released from the maintenance agreement. Yes, they were, Your Honour. What impact does that have on their standing? Well, they allege an express contract, Your Honour. Express contract with whom? They allege an express contract with the Federal Home and Bank Board. The release was bargained for by the thrift. So the effect on the standing is merely one facet of the transaction as negotiated by the thrift. But the overall picture is that the Trust never had an agreement. They never signed anything as part of this transaction. They never became a party to the transaction, which is how the parties wanted to structure it. Under the SoCal decision, which directly applies here, the SoCal shareholders did not sign the assistance agreement. They chose to structure it that way. They used the corporate form for protection. The Court rejected the idea of an overarching contract, even though the shareholders had arranged the acquisition and funded it, and even though the government knew about that. The Court refused to look past the corporate form, the structure of the transaction, which is exactly what the Court should do here. They should say, how did the parties structure the transaction? They chose to structure it to protect the Trust. The thrift chose to structure it to protect the Trust from liability, and that's how we should take into account and consider the net worth release. That further protected the Trust from liability. And the Court should conclude that the Trust avoided its previous liability. So you're not challenging any of the findings of the Court of Federal Claims as to whether, in fact, the Trust held 90% or more of the thrift and the various other findings as to, which in their view, the real party in interest? Well, Your Honor, we do not challenge the fact that the Trust had held 90% of the interest in the thrift. In fact, we believe that that was consistent throughout both before and after the transaction, which undermines the plaintiff's claim that they somehow contributed. The Trust always owned 90%. As far as whether the thrift acted – whether the Trust was a disclosed principal, that really has no bearing on the underlying determination. Even if the thrift was acting as some sort of agent for the Trust, under standard agency law, the language in the agreement would control. So first of all, the plaintiffs aren't alleging it, but if – hypothetically, if the Trust were alleging that it was a party to the assistance agreement because the thrift was acting as its agent, we would have to find that in the assistance agreement for that to happen. There's no such language here. So the way they structured the deal was only the thrift participated – and there's no doubt about it – only the thrift participated in the assistance agreement. Only the thrift became responsible for the 3% capital requirement that was in the forbearance letter. Only the thrift received the forbearance letter. Only the thrift took on the risks and performed under the assistance agreement. Under the Domino's Pizza case, the Supreme Court considered – held that the fundamental purpose of corporate and agency law was to honor the corporate form. A shareholder had no rights and no liability to enforce a contract of its corporation. And in that case, the plaintiff claimed it negotiated, signed, performed, and enforced the contract and that it was its own. And the Supreme Court unanimously rejected that argument. You're saying that if the SSA had been the plaintiff, you'd have no argument. Is that right? There would be – we do not argue that SSA was a party to the assistance agreement. Not at all, Your Honor. The Trust was not, though. They used the corporate form. Just take a step back, Your Honor. Before this transaction was done, Southwest Savings, the thrift, was $60 million out of capital compliance. There were projections that it might fall $100 million out of capital compliance. The thrift – the Trust was on the hook because it had an existing maintenance agreement. It was on the hook for all that money, potentially 100 – unlimited. It was not a limited maintenance agreement. Southwest Savings conditioned the deal. They said, we will only enter this deal if you release our trust from any of those liabilities. I don't understand. You're saying that nobody has standing to bring this claim? Well, the claims that the Trust is bringing – nobody has standing to bring the claims that the Trust is bringing because it said it contributed the sub-debt, which the thrift – the thrift did not contribute the sub-debt. But Southwest would have standing to sue for damages received. Southwest – Or a receiver in its place. Southwest would have standing to sue on an allegation of a breach of the capital claim. It would not have standing to sue on the damage claims asserted by the Trust because they – first of all, nobody contributed. I mean, they would not – under the contract that Southwest Savings participated in, under the assistance agreement, there is no term called for an equity contribution. So the thrift would not be able to seek that because there is no term to seek. You're saying nobody has standing to bring the full claim of loss even if it's acknowledged that that loss was the direct consequence of the enactment of FIREA. Not at all, Your Honor. If – what we're saying is that Southwest Savings, the thrift, would have standing to sue for the breach of the capital credit. And they could allege harm – presumably they could allege that we committed certain harms to the thrift. But you have to understand, Your Honor, that this thrift was in such dire financial state before it entered the transaction, it would have a very – it would have had a very difficult time proving any kind of harm. It was predicted or projected that it would fail if it didn't enter into this transaction. So the type of harm that it might say we experienced, lost profits and the like, that would be – I mean, that's been a hard road for anybody to show. But it would be especially hard for a thrift that was out of capital compliance and expected to fail absent the transaction. So that – they would have standing to pursue that claim. It's just we don't believe it would be a meritous claim. Let me change the subject slightly, and I'd like your comments on the sub-debt contribution of equity in this case. Yes, Your Honor. What are your views on that issue? Your Honor, the – We're talking about stock warrants and what – and I'd like to know your concern. Okay. The first is, Your Honor, even if there is an agreement, there's no terms that called for these two. So even if the trust had become or was a party to some sort of agreement with the government, there's no terms that are spelled out anywhere that say that they had to – that they were compelled to contribute the sub-debt or that they were compelled to contribute the equity. Those terms rely – reside to the extent that they reside in the assistance agreement. The assistance agreement did require the thrift to convert the sub-debt. That was an obligation of the thrift, not the trust. There was no obligation anywhere for anybody to contribute the equity. The trust held the equity from the beginning to the end of the time. Landmark says you can't get restitution if a contribution isn't made under an obligation, and there was no obligation for the trust to do either. If at the last minute the trust said, look, we've changed our mind. We're not going to contribute. We're not going to allow the sub-debt to be converted, the government did not have a cause of action against them. So your position is that these items shouldn't have been included and considered at all? Yes. They're not terms of the contract. They could not – and they shouldn't – so they wouldn't be available for restitution even if there was a breach of the alleged contract. If we disagree with you on the equity, what effect is it that the stock in question was not – there were warrants and not a direct contribution of stock? Your Honor, the warrants and the preferred stock that were issued were issued by the thrift under the assistance agreement. The trial court held that those did not dilute the trust's ownership. So the existence of those should have no play in the court's analysis. They were an obligation of the thrift. They were completed by the thrift, and the trust – it didn't affect the trust. If I could, the plaintiffs are only asserting an express contract. They have made no assertion of an implied contract, and there's only two documents that they suggest contain this express contract. And given the importance of the language in an alleged express contract, we would invite the court to look at these documents. The first is the HE3 application, which the plaintiffs say is the offer that they provided to the government. It's just an application. It's required for the approval of any holding company where the thrift is entering into an acquisition. It can be found at A301-664 of the joint appendix. It's only three pages long. In this document, the first page of the HE3 application is merely a form. It's just for them to type out the names of the different parties. However, in this – on this first page, the trust puts a disclaimer. It says in the footnote, in the asterisk footnote, seven lines down. It has the line that begins with the word accordingly, and it says, Accordingly, the filing of the information contained herein solely to obtain approval of the transactions described herein. And then it goes on. If they're alleging – which they are – an express contract, this offer has to show that they had the intent to contract. On its face, not what somebody else testified. It has to do it on its face. Here, they say expressly that the information contained herein is only to seek approval. But Winstar tells us that all of these documents, the approval documents, the applications, everything else, are part of and can be viewed as an integrated contract to understand – for everyone to understand what the arrangements were and what the relationships were. They have to be integrated into something. There is no assistance agreement integrating these documents because the trust did not sign it. No. In Winstar, they each did not necessarily refer to the other. But it's not a question of reference. At some point, there has to be an express agreement somewhere that integrates other documents. And there is here, the assistance agreement. I don't think that existed in Winstar. If that's not the case, Your Honor, then to the extent that we're talking about documents that are non-integrated, we're talking about an implied and fact contract, which is not being alleged by the plaintiffs. No. That isn't what I was saying. In Winstar, according to this Court and the Supreme Court, all of the documents surrounding these extraordinarily complex arrangements over a period of time formed an integrated contract. Your Honor, with all due respect, what Winstar suggested was – well, first of all, the Supreme Court did not find that there were contracts. They relied on the Federal Circuit and its holding and did not challenge it, but it did not find it. But moreover – I didn't say it was wrong. That was the government's challenge, and it was not accepted by the Supreme Court. But moreover, Your Honor, and more importantly, those cases were express contracts. Those were cases where people signed express agreements. Here, it's not that transaction documents can't be contractual, but they have to have the language to show it. This is a case-by-case need to look at the documents to do it. Resolutions have different languages. Documents that people submit have different languages. So we asked the Court, look at the language here in this H.E. 3 application. The second page of this H.E. 3 application, the third paragraph says, by this application, H.E. 3, Southwest Savings and the Trust, to the extent required by law, requests the approval of the FHLEB. They're only doing it to comply with the law. If they had put in language, we'd like to have a contract. That's something we'd really like. Then you could look at this and say, well, maybe that's an offer. But there's no such language in this document. It is just a regulatory request. And as a— Yes, we have that point. Thank you, Mr. Dinser. We're out of time. Thank you. Ms. Stewart. Good morning. After a full month of trial on liability and damages, the trial court in this case found that the Caroline Hunt Trust Estate was party to a direct contract with the government. And it found that because the negotiations that were detailed into every specific aspect of this deal had been structured and had been, in the words of the Court, CHTE called the shots about all those transaction points. Does that make a difference? What is their obligation in the contract? The CHTE's obligation in the contract is to use its preexisting thrift to acquire four failed thrifts and to directly grant 50 percent of the stock in the new institution through warrants to the FSLIC, to grant preferred stock for the first $54 million of profits in that new thrift, and to give up $23.8 million of its own sub-debt that only the Trust could own. In exchange for what? In exchange for the massive assistance that was going to be given to the thrift and in exchange for forbearances and waivers directly to the Trust. Remember, we have those approved in the resolution. There was a process by which the Trust was eliminated from any future liability of maintenance of— As one term of this contract, you bet, the Carolyn Hunt Trust Estate asked to be released from the old net worth maintenance letters. They were not RCMAs. They were letters. As we demonstrated in our cross-claim, we later know they're not enforceable. Those were enforceable letters? They were not enforceable letters as we demonstrated in our cross-claim, but they were of concern, of serious concern. Because they would have been obligated to pay $60 million, wouldn't they? No, because they were not enforceable, they would not have. That was the threat. At that point? At that point, that was a concern about whether they were enforceable. We submit and our evidence shows that everyone knew they were of dubious enforceability because they were not the RCMAs that this Court has addressed in other cases, like SoCal, the enforceable written agreements that are bilateral. But there was a concern about them, and so they asked that they be released. But when Mr. Dintzer said this is the only case where there's a release like this, Your Honor, this is the only case where a holding company was asked to approve giving away half of the interest of the resulting thrift to the FSLIC. It's the only case where there were preferred stock terms that gave away $54 million of profits. I submit that that is equally consideration being exchanged at the highest level between the trust and the government. There was a specific finding in this case that only the Carroll Hunt Trust Estate could approve those warrants for the common stock. Only the Carroll Hunt Trust could approve the issuance of the preferred stock to the FSLIC. This was not something that the thrift could do itself, give away its own equity, and the trial court made that specific finding after hearing all of the evidence and the expert testimony. Ms. Stewart, how do you reconcile the integration clause with the sole benefit clause? Your Honor, the Carroll Hunt Trust was not a party to the assistance agreement. We are not here suing on the assistance agreement. We would be here with— What are you suing on? What are you suing on? What contract? The agreement that is demonstrated by the HE3 application that we filed that was approved by the Federal Home Loan Bank Board resolution. And in that resolution, just like in the home savings case, the approval of the capital credit, the heart of this WinStar case, is in the resolution. It is only later put into the assistance agreement because the Federal Home Loan Bank Board has approved it in the resolution. You may find the offer, the acceptance, and the consideration in those Federal Home Loan Bank Board resolutions. And the H3? And the H3 application? The HE3 application, based on the trial testimony, was considered by the government to incorporate all the six months of applications that had been filed by the Savings and Loan on behalf of the Trust and the Savings and Loan Jointly. So you will not— Wasn't that really a request for approval? The HE3? Absolutely. Merely a request for approval to do what? To put four Bankrupt S&Ls together. To allow the thrift to acquire four failed thrifts. In the resolution approving this transaction— And it was itself failed, though, wasn't it? I'm sorry? Wasn't Southwest also failed? No, it was not failed, Your Honor. It was underwater. It is really distressing to hear that this thrift, it was below its capital requirement. It was underwater. It was one of the best thrifts in Texas at the time. It had positive capital— But was it underwater or not? Was it meeting capital requirements? It was not meeting its capital requirements, but it had about $29 million of positive capital. It was not insolvent. It had one of the best management teams that the FSLIC had concluded. Let's beside the point. The point is whether or not, at that point in time, there could be a call on some equity addition for capital contributions from the parent. Your Honor, the government never called on the Caroline Hunt Trust Estate to honor those old letters. Was it because they were dubiously enforceable? Probably. Was it because they wanted them to participate in the Southwest plan instead? Yes. Probably because CHT requested the acquisition of the other four through its Southwest subsidiary. Your Honor, it didn't happen that way. The government came to my clients. They begged them to participate in the Southwest plan. The Southwest plan was the biggest deal a federal home loan bank had ever put together. We were the first transaction, large transaction close in the Southwest plan. There was a press conference after the deal. The government was so happy. We have a strong thrift. We have good management. We're going to do the first Southwest plan acquisition. Now, they provided the capital credit to provide the capital and let that happen, but they trusted the Caroline Hunt Trust Estate. You can look in the approval resolution. The first page said Caroline Hunt Trust has made an application to acquire. The second page of the resolution makes all the holding company findings. It's a qualified acquirer. It meets the management, the resource requirements of the statute. Caroline Hunt Trust made this acquisition as a matter of law. The trial court also made that specific finding. But it didn't sign any documents, though. Your Honor, in the resolutions approving this transaction, the subdebt was required to be contributed. Which ones? The resolution of the Federal Home Loan Bank Board, which you may find at A2000002-3, identified as a condition to the entire assistance agreement that the subdebt would be contributed. A separate release executed by the bank board on the same day. Contributed in exchange for the release of the capital maintenance agreement. No, there is no in exchange for language. In some of the documents that are examined in the briefs of the parties here, we see that they were linked. The testimony was consistent in the trial court. It was simultaneous, wasn't it? Everything was simultaneous here. At the closing of this transaction, the subdebt was surrendered by the trust. The net worth maintenance was released. The assistance was provided. The warrants were given to the FSLIC. The preferred stock was given to the FSLIC. The closing here, everything took place exactly as it was. And what obligation did the trust remain with? The trust gave up a one-handed stand. No, what obligation did the trust remain with? What obligation was left to the trust at that point in time? To continue to own and operate in partnership with the government. It owned the? It owned one-half of the new thrift at the end of 10 years. That's the only remaining aspect that they have, right? They were the remaining owners by 50%. They had no contractual obligation to perform anything under any contract.  It was not put off until later. They gave those warrants. They gave the preferred stock. They absolutely performed on that day. They canceled $23.8 million of subdebt on that day. In exchange for certain consideration. They didn't do it out of the goodness of their heart. Your Honor, this client entered into a partnership with the government as the trial court found, a 10-year partnership because it wanted to do the right thing in Texas. It believed that at the end of 10 years, being a 50% owner with the government in a large thrift, that by that time would be healthy. And by the way, there's a finding in this trial court's decision that by 10 years later, it would have been a healthy thrift. That deals, I believe, with Your Honor's concern about whether we were failing our capital requirement at the time. The Southwest plan was a 10-year plan. And at the end of 10 years, we know the economy did rebound. We know that the values in the properties and the loans on this thrift books would have been back to a positive status. What the Carolyn Hunt Trust lost was the opportunity completely to carry out that 50% ownership. As a shareholder. It had an expectancy. As a shareholder. No, it had an expectancy interest in this contract, which was that 50% interest. Now, we acknowledge that we had a reasonable certainty. Is that really a shareholder basis? That their 50% in 10 years would have been worth more than 100% of what failed? They certainly hoped it would, Your Honor. So as a shareholder. Not as a contractual obligation. No, as a contractual party that had specifically given away. Remember, the finding here is that only the trust could give away the 50% of the common stock. Only the trust could give away those warrants. They made that decision as a contract party. They also, as a matter of contract, gave up their sub-debt. Your Honor, this argument that the sub-debt is not required to be contributed appears only in the government's reply brief. So I would like to go through the other documents. I started telling you. First, we have the Federal Home Loan Bank Board release calling it a condition. Second, we have a release document in the appendix at A2004 saying the trust will contribute to the association. All subordinated ventures. Third, in the principal staff recommendation that went to the Federal Home Loan Bank Board recommending this deal, it said the CHTE had agreed, the word agreed, to substitute permanent regulatory capital in exchange for subordinated ventures. This document, by the way, is cited in our complaint back in 1995. Number four, there's an OTS memo, government memo, right after the deal saying that the balance of the sub-debt had been converted to equity and represented the institution's capital contribution. And finally, all the notes that were delivered and canceled on the day of closing say, in handwriting, canceled May 18, 1988 as a contribution to the equity capital of the maker by the payee, the payee being the CHTE. Now, what do you make of that equity contribution? What does that mean, that their equity contribution is made to whom? Well, they have converted a debt obligation. The Southwest Savings was paying them on a monthly basis until they canceled the sub-debt. I understand that. I understand that. That was subordinate debt. That's correct. Which was eliminated and contributed, converted to equity. That's right. As a term of this contract, from all these documents. So as a conversion of equity to equity. Now, if I'm a stockholder in a particular company and I'm a parent and I convert my debt, which the subsidiary owes the parent, to equity, that increases my equity in the sub. Is that correct? Yes. If I have 100% ownership, it just gives me more ownership. If I'm 80% ownership, I get more equity. But do I have standing to sue if that sub actually goes bankrupt? Your Honor, it depends on. The cause of the bankrupt? All the case law is whether there were contractual obligations directly between the parties. If the shareholder entered into an agreement where the obligations were exchanged directly with the other party, he has standing. We are not suing on the contract of our subsidiary thrift. That is not from the beginning of this case. We are suing only for what we lost. What contract are you suing? We are suing on the overall contract found by the trial judge in this case. I don't see the contract. The contract is evidenced by the application, the approval, the Federal Home Loan Bank Resolutions that required us to do all of these things. We gave up $23.8 million of sub-debt. That was debt owed to the Carroll Hunt Trust. In exchange. In exchange? We simply gave it to the thrift. We didn't get a higher equity position in the thrift. You get a lower equity position, as it turned out, right? We did not, from the simple conversion of the sub-debt, get any higher equity position. But I'm still trying to figure out, in my own mind, as to how the contract obligation of the trust is established. Because the Federal Home Loan Bank Board looked to the trust to deliver what it wanted. It wanted 50% of the common stock. It wanted the preferred stock. Those were FSLIC desires. They got them. And they got them because the Carroll Hunt Trust approved it. They also wanted that subordinated debt to be contributed. And it was. It was written off. Wasn't that also changed because of the exchange for the maintenance, capital maintenance agreement? That was also eliminated. That's right. That's one of the pieces of the consideration flowing directly to the trust. I mean, this court has found in other cases that where it didn't find consideration flowing directly to the holding company or directly to the individual shareholder, there wasn't a contract. There's no question here that the Federal Home Loan Bank Board gave that release directly to the holding company. It also gave forbearances, affiliate transaction waivers. It gave holding company debt waivers directly to the trust as part of this transaction. So we have that exchange at the top level here, making the trust a party. I submit, Your Honor, that there is absolutely no difference between the facts that you and I have been discussing and the home savings case. There are four principal reasons why home savings has already resolved every question about whether the holding company is a party. The holding company at home did not sign the assistance agreement, just as CHTE did not. The holding company filed the application under HE3. It was approved. The resolutions themselves, in the words of this court, evidenced the reciprocal promises that went directly from the holding company to the government. Now, the suggestion that those reciprocal promises have to be capital maintenance is where I depart strenuously with what the government says. What there has to be is an agreement, the reciprocal promises granting the 50% common stock, the preferred stock, contributing the subdebt. Those are promises. Every bit as substantial as entering into a new RCMA, particularly when what we gave up was a very dubiously enforceable RCMA in the beginning. I suggest that the—I believe my time is up. You could finish the sentence. The SoCal decision is also very clearly on the side of the plaintiff here because SoCal held that the individuals above the holding company did not have the standing. It was the holding company in SoCal, just like the holding company here, that filed the applications that were approved by the resolution. And I submit that SoCal would be helpful here only if Mrs. Hunt were here, arguing that she was a party to this transaction because she is the sole beneficiary of the trust. But she is not here. We are here alone, alleging only the damage to the holding company, not any of the damages suffered by the thrift in this case. Okay. Any more questions for Ms. Stewart? Questions? Thank you, Ms. Stewart. Now, Mr. Dinsher, we've exhausted your time, but we'll give you one sentence if you need it. Perhaps a compound sentence, Your Honor? No. No, no, no. I'll keep it to one sentence. Your Honor, based on the fact that there is no contract with the trust, and if there was, it certainly didn't have the capital credit and the other terms that it alleges, we ask the Court to reverse the judgment of the trial. Yeah. We understand. That's the issue. Thank you both. Mr. Dinsher? Thank you.